Your Honor, this is the second case of the morning called 210-1257, Borchers v. Franciscan Tertiary Province of the Sacred Heart, Inc., who is assessed Mace Lake Village, Inc. On behalf of the acquirer, Ms. Rebecca Cahan. On behalf of the acquirer, Ms. Heather Waters. All right, if all is set, it's ready to proceed. Okay, then you may proceed when you're ready. Good morning. My name is Rebecca Cahan of Avery Comerlingo Kill. On behalf of the plaintiff, the parent, Diane Borchers. Excuse me, can you pull the microphone a little closer to you? Does that work? It's better. Okay, thank you. The court has asked counsel to be prepared to argue the U.S. Supreme Court's holding in Krupski v. Costa-Crociere in determining the proper scope of Section 26160 of the Illinois Code of Civil Procedure. I'm prepared to do that today. Krupski involves Federal Rule 15bc, which is virtually identical to Section 26160 of the Illinois Code of Civil Procedure, except with regard to the service time. Federal Rule 4m, as stated in 15, states that service is to be effectuated within 120 days from filing the original complaint. Illinois Supreme Court Rule 103b does not have a specific time limit for a service like the Federal Rule. And the purpose, the rule of 103b, is in promoting the expedious handling of suits by giving trial courts wide discretion to dismiss when service is not effected within reasonable diligence. And turning to the holding of Krupski, the U.S. Supreme Court decided to resolve or take that case to resolve tension among the circuits over the breadth of Federal Rule 15. The District Court and the U.S. Court of Appeals for the 11th Circuit found that there was no relation back because plaintiff knew of the proper defendant's existence before the statute of limitations expired and simply lacked knowledge as to the correct party defendant. And since this was a conscious choice, those courts found there was no mistake because it resulted from a lack of knowledge. However, the Supreme Court in Krupski said that the proper inquiry is not what the plaintiff knew or should have known, but whether the new defendant knew or should have known within the foreign time period that it would have been named in the suit originally, but for some mistake. So the emphasis is on the defendant's knowledge or the potential new defendant's knowledge rather than the plaintiff's knowledge. And I believe that the trial court in this case put the onus on the plaintiff as to what she knew or should have known when she filed her suit as to who the proper defendants were. Let's talk about the court's ruling with respect to Maxwell. And look at Ms. Maxwell in conjunction with the Krupski case. Okay. You reasonably knew or should have known. Okay. With respect to Maxwell, while first Krupski highlights five important things that the court looked at in determining whether the new defendant knew or should have known whether they would have originally been sued. One is the complaint itself. The complaint is the first instance that should give a defendant notice as to who the party was intended to be. And the complaint sets forth, specifically the original complaint sets forth, exactly who those persons were. That is, the Maeslake personnel who accessed her personal e-mails. She didn't know who they were. Now, when we look at Maxwell, she testified that she first learned of the lawsuit prior to being deposed, when she was asked to be deposed. Within a few days. Within a few days. All right. However, I think that it is clear that she knew well prior to that, that she would have been a defendant in this case. I'm sorry. That's okay. We all have the same question. What evidence do you have to support that assertion? Well, first, she was named as a witness and as a defendant in the defendant's answers to interrogatories. She was named as a defendant? Well, she was referred to as a defendant in the answer to interrogatory. And she was disclosed as a witness. So, likely, it's reasonable to infer that when you are naming an employee as a potential defendant or a potential witness, that there was some investigation prior to answering those interrogatories and some notice to that person that they would be named. This is Maeslake's answers. Correct. They're Maeslake's answers that were prepared and attested to by Frigo and notarized by Maxwell. So, based on that, it's reasonable to infer that she knew sometime prior to the answers to interrogatories, which was approximately December of 2009. Was that within the statute of limitations? The statute of limitations expired in September of 2009. So, it would have been beyond the statute of limitations, but within the 103B time for service. Because, again, it's a reasonable time for service. There's no 120-day rule. It's your supposition that it's within a reasonable time. Exactly. That was about three months later. Okay. Any other reasons why you believe she knew or should have known? Yes. I believe that she knew or should have known what exactly, we can even pinpoint it a bit further, exactly when Frigo knew. Frigo testified that... No, this is about Ms. Maxwell. Right. When did she know or should have known? I believe that she knew or should have known exactly when Frigo knew from the get-go because their involvement with the accessing of the e-mails was so part and parcel of each other that when he first knew, it's reasonable to infer that she would have known as well. Because? Because of their involvement in the accessing of the e-mails because Frigo was the person who directed her to go and access. Because they worked together in the same way. Because they worked together and it was at his directive that she went to the computer in the first place. Had he not done that, perhaps she wouldn't have gone there, but at his directive, she went to access the e-mails and brought them back to him. They were the only two involved. Counsel, though, it's not when she knew or should have known about the events. The question is when she knew or should have known about the suit. Well, stemming from that, because Frigo knew or should have known when the original complaint was filed because the original complaint said, Diane Borges does not know at this time the specific individuals or the specific personnel who accessed her e-mails. But she doesn't know that at this point. He should have known that that referred to him and Maxwell. Well, how do we know he knew about the lawsuit? Just like Maxwell, how do we know what he knew about the pending suit? He knew when it was physically received. He's the vice president of Maeslake. He knew when it was physically received at Maeslake in May of 2009. Is that yours, the record, or is the record established that he was? The record establishes that. That's what he testified to. Who was actually served? Another agent. So, I mean, how do we know? This is a lot of supposition. How do you know that he, or when, how do you know when he became aware of the lawsuit? He testified that he became aware of the lawsuit when it was first physically received at Maeslake, which is in May 2009, when it was first physically served. Did he testify to that? He testified in his deposition to that. So he knew when it was served. He knew when it was served. And then it's your position that because of a relationship between Frigo and Maxwell, that he must have immediately told her, guess what, you're the unknown defendant. Exactly. He should have known. And that's your supposition. That's my supposition. Is there anything in the record that you can point to where she says, I spoke to him, or he says, I told her? At the time, in May 2009, when it was first physically received, there's nothing in the record. However, what we do know is that at least at that point, he should have known, and that was well within the statute of limitations period because it was even before it expired. Okay. With regards to her, at least we can definitely pinpoint that she should have known prior to answering the interrogatories. Which still puts you after the statute of limitations. But still within certainly a reasonable time within the 103B period where she could have, where it would be reasonable that she would have known that she was an intended party to be sued. Is there anything in the record that would lay out for us or give us a picture of the size of this office or the relationship to Frigo and Maxwell within the actual physical office? In the record, the food service office or Diane's office was in a separate area in the kitchen. There was a desk and a computer. Right. A separate office. In terms of where Frigo and Maxwell worked in relation to that? No, not in relation to that, in relationship to each other. I don't know if there's anything in the record. She was his direct administrative assistant. She did everything for him, knows correspondence. She testified specifically that, quote, I do everything. So the relationship between Frigo and Maxwell is very entwined and very closely related because she is his direct assistant. I'd like to also point out that Frigo, Maxwell, and Maeslake have all been represented by the same attorney in this matter, both prior to and after being named as defendants. So there is a relationship between all of them in that they've all been represented diligently and vigorously by the same attorneys, and it's reasonable that when Maeslake was first served and the defendants council came in to represent them, that some type of investigation or communication was had as to who the specific individuals involved were. And because they all ended up being represented by the same council, it's reasonable to infer that they all knew or should have known within the relevant time period who the intended parties were. And in connection with the answer to the auditor, the attorney who now is representing them would have checked with a potential witness. Exactly, exactly. Well, certainly, is it Lipinski that they gave all of these e-mails to? Yes, yes, and that was the same firm that was representing Diane in the sexual harassment claim as well. That related to Frigo and Maeslake. Would it have made a difference if she'd hired her own attorney, Ms. Maxwell? In this circumstance, I don't think so. So if that's true, then what's the relevance of them having the same attorney? Well, the relevance of them having the same attorney is that this attorney likely knew, and I don't want to delve into attorney-client privilege, but it's reasonable to infer that at some point when Maeslake was at least named, there would have been some type of investigation as to who the specific personnel were. But really, they always knew who it was because they wrote the letter back two years ago stating that, or to Diane's counsel stating that, recently consistent with their practices, certain personnel accessed e-mails but didn't disclose those identities. So really there was an investigation. They always knew who those personnel were. It's just that Diane had no way to know. But isn't the issue that whether or not Ms. Maxwell knew, not what Maeslake knew and not what Mr. Frigo knew, but what Maxwell knew? Yes, and I think what I'm trying to get across is that their knowledge, Frigo and Maeslake's knowledge, can be imputed to Maxwell. Just because they work together. There is case law to suggest, there is case law that, or there are courts that have held there are two methods of imputing notice. One is the shared attorney method, which I think I just talked about in terms of all the original defendants and new defendants being named by the same attorney. The other is the shared interest and identity of interest method that requires the parties to be so closely related in their business operations or other activities that the institution of the action against one of them serves to provide notice to the other. Doesn't the Krupinski case allow us or allow one to impute knowledge? I'm sorry, can you repeat the question? Yeah, the Krupinski case allows one to impute knowledge. Yes, yes, and Krupski said that, I'm sorry, Krupinski, I'm sorry, looked at the factors such as the same attorney, looked at the fact that the complaint laid out specifically who she intended to sue. In Krupski, she intended to sue the owner of the ship, the entity that was responsible for controlling, managing, and everything that had to do with the ship. Krupski also says, look to the plaintiff's post-filing conduct to see if it could shed light on the new defendant's state of, or shed light on what the new defendant knew about the plaintiff's state of mind and her lack of knowledge. So certainly, Diane's post-filing conduct, the fact that she engaged in discovery and diligently did so in order to ascertain the identities of these individuals, shows that she did not know these people. And also, the court in Krupski noted that there was no strategic choice in the plaintiff naming the wrong person to begin with. And here, that's the same situation. There is no strategic choice for not naming Frigo and Maxwell other than they were simply unknown at the time. And the reason for saying unknown was to put everyone on notice, including defendant's counsel, that there would be parties named at a later time. And she just didn't know that. And also, the other point that the Krupski court also noted was, or looked at, was the defendant's actions and how those actions contributed to plaintiff's continued lack of knowledge with respect to the corrupt identities of the defendants. The defendant's actions here also do the same thing. Here, they didn't disclose, obviously, the Frigo and Maxwell in the letter written in April of 2007. But also, post-filing of the complaint, they filed a somewhat unusual motion to excuse themselves from verifying the answer, which was granted. So even with the answer to the amended complaint doesn't even tell us who the specific individuals were, and it wasn't verified either. Well, they struck their verification. They struck their, they were excused from, they did a motion to strike our verification, but they were excused from verifying theirs. So that would have not given us, at that point in time, any indication as to who the individuals were. Continue. Thank you. Did you have any other points you wanted to make? No, I'll reserve it for later. Well, I want to go back to this question. You, again, came back to a shared attorney is a factor in your favor. But I asked you, would it have made a difference if she had her own attorney, and you said no. Because she would have been disclosed in the interrogatories. Whether she had her own attorney or not, had she been disclosed in the interrogatories, at that point, in December of 2009, or sometime shortly before that, because of the preparation and the investigation, she would have known, surely, if she's going to be disclosing herself as a witness, and disclosing herself as the person who accessed the emails and had potential liability, she should have known, or it could be reasonable to infer, that she would have known that she would have been named in this suit. Even though she notarized her boss's signature, she didn't answer those interrogatories. She didn't answer those interrogatories. But in those interrogatories, she is named as a potential witness. And she is referred... By someone else. But, well, presumably by Frigo. Right. Right. Not her. Not her. But it would be reasonable to infer that if your employer or your boss or your supervisor is naming you as a witness, that you know at that time that you could have potential liability and you could be a potential defendant. Wouldn't you also construe it as that you would know or should have known that somebody thinks you know about the events underlying the suit, and that's why you're a witness? I agree with you on that point, too, but I think taking it a step further, because their interrogatories specifically referred to her as a defendant, quote, this defendant, a defendant, this defendant didn't use a password to access the emails, this defendant... That's how she was referred to, as this defendant. And to me, it's reasonable to infer that if you are going to be naming an employee as a witness, that that employee should have some knowledge of that and think, I might be named, I did this, I am responsible for accessing the emails. So that is a very reasonable time, by the time they answer the interrogatories, for her to have known or should have known that she would have been a defendant. Couldn't you infer that some of the answers to the interrogatories most likely were asked of her before they answered? Yes, you could. And so, therefore, you could even pinpoint it earlier than December of 2009, but even so, that's even less than 120 days if we were talking about the federal rule, but it's definitely a reasonable time period within 103B to have known or should have known that you would have been named as a defendant. If I can ask one further question. With respect to mistake, you know, we talk, we look at the Krupski case, and they describe what they feel, you know, a mistake is, and it's a little different than what the parties, the defendants in this case. It's a little different how the defendants in this case and how the lower courts in this case described mistake. Do you believe that the fact that the plaintiff in this case didn't join Maxwell and Freebell in the beginning was the type of mistake as set out in Krupski or the type of mistake as set out by the lower court? It's definitely the type of mistake as set out in Krupski. Krupski defined mistake very broadly to include inadequate knowledge and a misunderstanding of sufficient facts. So under that definition, certainly inadequate knowledge is exactly what was the case here. She simply did not know who these individuals were. And the Krupski, the U.S. Supreme Court in Krupski reversed the decisions of the lower court, and the lower courts were the courts that said this wasn't a mistake. A mistake is not simply lacking knowledge.  Krupski took it and reversed it. So in this situation, it's definitely the same as in Krupski. They say it's the antithesis of the mistake. Yes. Yes. And you can distinguish the Adams case? I'm sorry? Adams, the Adams case that the Supreme Court talks about? The Adams v. Nelson case, I believe. Adams v. what is the site on this Adams case? I think the Adams case was probably a little more of a deliberate choice. It was a deliberate choice. The only deliberate choice here was that she named unknowns. I believe it's the same case that I was just referring to, the Adams v. Nelson case. Adams v. Nelson. Yes. But in that case, it was a deliberate choice, and that was after judgment. After the judgment was already entered, the plaintiff then asked to add another party. And this is certainly not the situation here. Thank you. Thank you. Heather Watterson on behalf of the defendants. Just going in the same order. Defendants, plural. I represent Maze Lake Village, Michael Fredo, and Katherine Maxwell. And just sort of going in sort of the same order that counsel went in and talking about 616, I think the standard is not what is being relayed. The new or should have known standard under 616 comes into new or should have known that you were the intended defendant. However, you can't even get to that because the rule says that a person within the time the action must have been brought, plus the time allowed for 103B, received such notice of the commencement of the case. So it's really two standards. Number one, that you received notice of the commencement of the case, and then knew or should have known that you were the target defendant. The legislature was very clear in its language. They do not use that new or should have known language in that first part of the statute. So under with Katherine Maxwell, we have to look to whether she received notice of the commencement of the action, not whether she should have known because Fredo knew or Maze Lake knew whether she did know. And in order for her testimony to be discounted, one would have to say that she perjured herself. She said, I did not know. I might have signed the answers to interrogatories or notarized them. Her job as a notary is to look at the signature. We do not refer to Maxwell as a defendant anywhere in the discovery. In the very beginning of the discovery, we say, now comes defendant Maze Lake Village or Franciscan Tertiary Province of the Sacred Heart, and then continue to refer to defendant throughout the body, which refers back to Maze Lake. So you're saying the new or should have known, in terms of the notice of the suit, there has to be some actual knowledge of the suit, not should have known of the suit? Correct. The legislature is very careful in the new or should have known. New or should have known comes into when they knew or should have known they were the potential defendant. But before you even get to that, they have to have knowledge of the action. And the legislature does not use new or should have known. The prior version of the statute required knowledge within the statute of limitations. And what they did is they amended that statute to add the 103B language because what was happening was a plaintiff would file the lawsuit, as many do, shortly before the statute of limitations expired or on the day of. It takes several weeks to serve. So by the time that that defendant actually received service, received notice, was after the statute of limitations. So in order to correct that problem, the 103B language was added in there. And if you actually look at 15C versus 616D, the biggest difference between the two is 15C just says the person received notice. It doesn't say when. It doesn't say how. It just says notice. But under 616, it actually says when they have to receive notice. And that's within the time allowed by 103B. And, again, the purpose of that, the amendment to that was added to correct the problem that people were having because of the late filing of the lawsuit. But what has to be shown to establish that she got notice? How definitive does it have to be? Your opponent is arguing, hey, look, you know, let's look at the real world. There's a lawsuit against Maisley. They're answering interrogatory. Any attorney, as we know, is going to check and talk to potential witnesses. Otherwise, how can you responsibly answer interrogatories? So the subject of this lawsuit and your potential involvement is not going to come up? We did not talk to Catherine. We did not talk to Catherine. Michael Frigo answered the discovery. Michael Frigo was able to answer the discovery based upon his knowledge. He was able to answer all of the discovery based upon his knowledge and identified Catherine Maxwell not as a defendant, as a witness, and went through, and this isn't a situation where the complaint was amended or Catherine was added. We went through all fact discovery. Fact discovery was closed. We represented to the court that we are filing a motion for summary judgment, and then it was amended. So we, Catherine was produced as a witness. Her deposition was taken as a witness four months after we disclosed her answers to interrogatories. And she testified unequivocally. I did not know about this until shortly before the lawsuit was filed. There's nothing contradicting that. When Lipinski sent the e-mails out to the lawyer, I believe, and I could be wrong, in the letter he indicated that the e-mails were accessed and there was no code that was required  So are you submitting that he received this information not from Maxwell? The testimony is that when Catherine Maxwell received the e-mails, she immediately brought them to Michael Frigo. Michael Frigo contacted the president, who was Father Larry Dreffin, and Father Larry Dreffin then delivered those directly to their corporate attorney, not the same attorney that represented them in the sexual harassment case, but the corporate attorney, and said, we have these, figure this out. Catherine had no role in speaking to counsel and communicating that information to counsel. She merely, and I can get into, I think, with respect to Krovsky, I think Catherine's very different than Michael Frigo's position. Let's move away then from Catherine and now talk about Frigo. How do you submit to us that the trial court was not in error dismissing Mr. Frigo? I think if you look at Krovsky, I think the U.S. Supreme Court's opinion in Krovsky and the Second District's opinion in Siebert, and the legislative history behind the enactment of 616 is all very consistent. The court in Krovsky says that when a plaintiff is confused about the role that the party has in the ultimate cause of action does not preclude them from then having that complaint relayed back. So in Krovsky we have a plaintiff who was confused about the ownership of the cruise line. In Siebert we have a plaintiff who's confused about the ownership of the laundromat. And Siebert said that the relation back doctrine was enacted so that a corporate defendant could not avoid liability because of the confusing nature of a corporate defendant's status. And so that legislative history or the history behind that I think is consistent with Krovsky where you have a plaintiff confused about a corporate defendant's status. You have that same in Siebert. And I think the court in Krovsky, I just think the court took the analysis one step further than the Siebert court and explained what mistake actually means. And what a plaintiff knew is relevant as it relates to the defendant's understanding of whether a plaintiff made a mistake regarding the proper party's identity. And if you take the Nelson case as well as Krovsky and you look at those cases together, the court really laid out a two-part test. Whether or not the plaintiff knew of the rightful party's identity and whether they were aware of the role that that defendant played in the ultimate cause of action, whatever that may be. And if both of those are yes, then the defendant has the right to assume that they were not an intended target and that the plaintiff's election on not naming them was intentional versus a mistake. Here what we have is we have a letter dated September 2nd of 2007 that Ms. Borchers wrote to the provincial or the head of a religious order which was produced during discovery. And she makes a number of accusations, and I use that word very deliberately because on the second page of that letter she says, I can't prove this comment, but I think Father Larry or Mike Frigo affected my disability benefits. So she's very deliberate in saying, I can't prove this, but I think, I suspect, I believe they did this. On page one of the letter when she's addressing the email incident, she doesn't qualify it. She doesn't say, I suspect, I believe, I can't prove it. She says, I always believed Michael Frigo was eavesdropping in my office and that he installed a keystroke program on my computer to copy every word I typed for years. But I never thought he, Mike Frigo, and Father Larry would stoop to an all-time low. So at that point she's already accusing both men, not believe, not suspect, they did it. Let's look at it practically. The issue in Krupski is whether even with the delay, the mistake impaired the new defendant's ability to defend himself. What's the answer to that? Well, when Mr. Frigo sat for deposition, he sat as a witness. Catherine Maxwell sat as witnesses. Their prep, their testimony, they have different rights, they have different privileges as a defendant than as a witness, may be very differently. And again, counsel waited, plaintiffs waited, until all discovery was closed in the case. We had, we answered written discovery, we got records, we took her deposition, we produced our witnesses for deposition, depositions were subpoenaed, all discovery was closed before the election to name them as a defendant was made. And I think that's very significant because we would have to now, we would have to, they would have a right to reopen discovery, we would have to redo all of the depositions because their role as a witness is much different than their role as a defendant. All that's true, though. Doesn't Krupski evince a policy in favor of trying cases on the merits, not disposing of them on procedural technicalities? So how is that policy, how is your argument, which seems to be hanging in your head in a procedural technicality, consistent with the underlying liberal policy of Krupski? A defendant has a right to assert the statute of limitations as a defense. I think the Illinois Supreme Court has been very clear, and the appellate courts have been very clear, that defendants have vested rights to assert the statute of limitations. And that is the general rule, clearly. Right. And they have a right to a finality of an action. And in this case, this plaintiff, if we were to allow the Relation Back Doctrine to apply to a plaintiff who writes a letter verifying, I know they did it, and not file, it gives a plaintiff the right to say, I'm going to go against this defendant, I'm going to see what I can get, and when I don't get what I want, then I'm going to go against this defendant and say, well, it's Relation Back. And it allows a plaintiff to pick and choose who they want to target, and that's not the purpose behind 616. It's not what the court indicated in Krupski or what the Second District Appellate Court had previously answered in Siebert. Now, how do you propose that Mr. Frigo did not suspect that he was going to be named a defendant in this case, just because time had passed and they hadn't named him yet? Right. And what the court says in Krupski is that if you have both of those elements, you have someone who knows of the identity, which there's no question she knew of the identity. At what point? And know of the role that that party played, they have a right to assume you're not going to name them. And she clearly writes, I knew he did it. There's references after references in this letter where she says Frigo did it, and she did it as of September 2nd. She knew that as of September 2nd of 2009. But she also said, I knew that he had my office taped and I knew this and I knew that, which sounds to me like there were a little maybe paranoia, a little speculation. Did she actually know until the deposition or until the interrogatories the role that Frigo played? She says, I believed, I suspected he was eavesdropping. Again, she's very careful in the language that she uses in this letter. She says, I suspected, I believed he did it, I suspect he might have interfered with my disability benefits. She doesn't qualify that language when she says he did it. And then she goes on to say at the end of that letter, I cannot believe they, again referring to Frigo and Father Larry, they had the right to go into my AOL account. She again references they did it and she knew that they did it back on September 2nd of 2007. Okay, so then all the more reason why he should not be surprised when he's joined as a partner, correct? The only, had she done it in a timely fashion, but again, the court says you have a right, I'm going to go back to the language in Krupski, you have a right to rely on the fact that you're not going to be named as a defendant if the person always knew of your role and didn't take action to do that. And that's the ultimate outcome of Krupski. Counsel, you spent most of your time, I think, addressing the role of Ms. Maxwell and Mr. Frigo, but you have the overarching issue about the summary judgment. And I do want to ask you a question about that. The trial court stated specifically in its ruling, I quote, I find as a matter of fact, I find as a matter of fact it's more likely an accident than that's from an intention. So summary judgment is granted. I'm sure you're well aware of the well-settled law that the purpose of summary judgment is to determine whether a genuine issue of material fact even exists. Correct. The case law says it is not to decide a question of fact, which was precisely what the trial judge did there. How is that not a problem? That all goes back to intent. And intent, while it can be a question of fact, it also can be a question of law. How can intent be a question of law? If what the case law says is that if a defendant has a burden to put forth their intent, if the defendant does that, the burden shifts to the plaintiff to put forth facts, not argument, not speculation, countering that intent. If they don't do that, then intent can be decided in a motion for summary judgment, which is what the court or trial court did. The evidence is there, is it not? They didn't need to say anything. There's evidence of opening e-mails and saying, hello, ma'am, David Capperfield. Do they need something beyond that to create a question of fact? The intent is not just accessing the e-mail. Under the Stored Wire Act, which it was represented that's a civil statute, that is incorrect. The Stored Wire Act is a criminal statute that is contained within 18 U.S.C., which is the crimes and criminal procedure provisions of the statute. And when the Senate, when that was enacted, they discussed the legislative history behind that, and it's a criminal culpability standard. It's not just accessing an account. It's a heightened standard, and she, Ms. Maxwell, had to have intended to access a personal e-mail account. I asked plaintiff in her deposition, do you know how, why, I don't know any, I don't know how they were accessed or why they were accessed. Mr. Frieda, Brenda Gordon, and Catherine Maxwell all testified why they were accessed, and that was that even though Ms. Borchers sort of knew she was going to take this mental health leave of absence, that was not relayed. So Maeslick itself wasn't able to plan for that leave of absence. She called in sick one day and didn't return. Her temporary replacement was overwhelmed. She hadn't had time to order food. She hadn't had time to check on food and went to Mike Frieda and said, I need help. I'm overwhelmed. Mike Frieda told Catherine Maxwell, go down, help her with the e-mail, help her with the mail, help her with the phone, because that's how they received food orders, that's how they placed orders, all through this e-mail. But therein lies the contrary argument. You're saying there was an ostensible, legitimate purpose initially granted to go to open the e-mails. Correct. So you're saying then it doesn't matter, no matter what the e-mail reference is then, anybody can look through them because we think we're there to talk about food service orders even though the e-mails clearly indicate beyond a shadow of a doubt it's got nothing to do with the work or with the food orders status, it's okay to go through all of the personal e-mails. Well, the question is not whether or not we went into a personal e-mail account, because that was not, Catherine didn't know that was a personal e-mail account. Okay, but once she got into it, you're saying it doesn't matter, then the subject matter is irrelevant according to your argument. It has to be. Correct. If you believe that that is, it depends on circumstances, but if you look at U.S. v. Bailey, U.S. v. Bailey is not a Store Wire Act case, but it is a case about whether or not an employee has a right of privacy in a work-related e-mail account, which is what Catherine believed this account to be. And they outlined several factors to determine whether you have a right of privacy. One, is there a computer usage policy that says that you don't have a right of privacy in this account, which we have. You have that with respect to any communication that was transmitted via Maeslake Technical Resources. Correct. And? Well, when you have e-mails that are coming in from outside of Maeslake, when this gal is home and not working at Maeslake anymore, and they're coming in after she left and they're still copying them and going into them and going into her sent e-mails after she left, how can you argue that she was protected, that they were protected by their technical, their waiver, so to speak? I think we have to step back and look at, the first analysis is, did we have authorization to go onto the computer and go onto what she believed was the work-related e-mail account, the Comcast account? Did we have authorization to do that? And what we're saying is, yes, we had authorization to do that because of the policy, because there were no password protections, because she was not the only one who used that e-mail account or the computer. But I thought she went onto an AOL account. That's the first section of that. Then we have to get to the AOL account and say, we're not saying we had authorization based on the computer usage policy to access that. That's not what we're saying. What we're saying is, okay, if we didn't have authorization to turn the computer on, that's irrelevant, because we would be in violation if we didn't have authorization to even go onto the computer.  The second part is that, did we accidentally access or did we intentionally access a personal e-mail account? And under the Stored Wire Act, what is actionable is the logging on, the accessing. It talks about, it's a facility by which an electronic communication is provided. The facility is the AOL account. So when Catherine logged in, she didn't even log in. She clicked on Internet. Two e-mail accounts opened up. She goes through all of her testimony on, we used to use AOL. A lot of employees still used AOL. Father Larry used AOL. Joe Moffitt did. So a lot of the employees, and this was a, Maeslake had previously issued AOL accounts to its employees. They're not on the server. And then had issued Comcast accounts. Some employees still chose to use their AOL accounts. One, they found one employee. Two, Father Larry and Joe Moffitt. Now, you're, so Maxwell knew of the sexual harassment suit, correct, when she went into those e-mails? She was interviewed relating, but the sexual harassment suit had not yet been filed. The charge of discrimination was filed in June. She knew that an allegation had been made. She knew the allegation. Right. Because she went in there. Correct. So she not only clicked on the AOL account, she opened them, correct? Two accounts popped up. She turned on the computer, two accounts popped up, the Comcast and AOL. When she went into the AOL account, she saw e-mails to and from Gordon Food Services, which was the provider, to and from different employees of Maeslake, recipes. So there was, she assumed, based on that, that it was a work-related e-mail. But she then testified in her deposition that she felt that the e-mails were vile and that they were vulgar and that she really needed to show these to Mr. Frigo, correct? Correct, because she believed it was a work-related e-mail account. It goes back to whether or not she printed them, whether or not she read them, whether or not she decided to show them, that's not actionable. What's actionable is did she have the intent to gain access to a personal e-mail account, the intent, the criminal culpability intent required by the Stored Wire Act, when she actually logged into or went into the AOL account? So when they realized that these weren't work-related e-mails, she printed out those that were coming in, those that were sent, those that were communications after she left, basically, for all intents and purposes, the company. After they realized that, then they shredded all of them, correct? They did. Well, they forwarded them to legal counsel and what legal counsel? They did not maintain, they didn't shred, they did not maintain any copies. Who maintained them? They gave, I don't know. I didn't maintain them. So who attached them to the sexual harassment response? Claims counsel did. The e-mails to the sexual harassment response? Oh, those were sent to the lawyer. Correct. The lawyer. So they weren't shredded. But once they realized that these were personal and not business accounts, I asked you if they shredded them. They didn't shred them. They gave them all to their counsel. Who gave them all to whose counsel? Mr. Frigo provided them to legal counsel, their corporate legal counsel. And corporate legal counsel didn't shred them. As a matter of fact, they passed them on to other people, correct? Correct. But whether or not they printed them, whether or not they gave them, what they did is absolutely, it's not actionable under the Stored Wire Act. There are a number of other federal statutes and state statutes that either were brought and were previously dismissed and chose not to appeal or they never brought to begin with. And sharing that information, printing that information, reading the e-mails, that's a different statute. That's not an issue here. The only issue is whether or not Kathryn Maxwell had the criminal intent when she went into that AOL account. Everything after that is not an issue of the Stored Wire Act. Counsel, I think you've done a very good job of discussing the various issues raised by the evidence. But couldn't that lead one to conclude that's exactly why you don't grant summary judgment, because there are issues of fact? I don't believe there are issues of fact because Kathryn testified very clearly what she did and why she did it. So Kathryn's testimony is the only thing to be considered. There's nothing on the other side to counter it. Can't intent be gleaned from the actions? As long as that doesn't amount to speculation and argument. And in order for plaintiff's theory to be correct, in order for their argument to be correct with what Kathryn Maxwell would have believed, when Mike Friegel said go check the working e-mail and make sure nothing's going on, Kathryn Maxwell would have had to have said, you know what, I'm going to see if there's anything related to the sexual harassment case that I don't even know exists anymore. So she would have had to, with that intent in mind, gone down, gone into that thinking, she must have written about the sexual harassment case. She must have written about trying to obtain Social Security workers' comp under fraudulent pretenses. I'm going to go see this. And then she must have, knowing that she's going to file the sexual harassment charge two months later, and that these e-mails are going to be used to defeat that. There's a lot of jumps that one has to make in order to get to that point. And there's absolutely no facts at all that Kathryn believed knew any of that. And anything to the contrary is arguments and speculation. Thank you. Any other questions? Thank you very much. Counsel, what's your response to your opponent indicating that the intent would have had to go in, she would have had to go in knowing that that was not a work account, and she did not know that at the time she went in, regardless of whether she was in there, she then discovered what the e-mail showed? The intent, as defined under the SCA, is one who intentionally, without authorization, accesses electronic communications. That is the standard. I think counsel pointed to that she would have had to have criminal intent. The SCA is a civil statute that provides for civil redress. There's nothing in the statute that requires civil intent, or criminal intent, I should say. But she intentionally accessed that account. But what if she didn't know that that was not a work account? She knew that Diane was only using a Comcast account for work. Can you point to something in the record that would show that? Her testimony at her deposition. Did she know then or did she know it at the time of her deposition? She knew that Diane used an AOL account, I'm sorry, a Comcast account throughout her employment. Well, that's obviously not true because at some point everyone had an AOL account. That is not true. Nobody, there are no employees at Maeslake who ever had any AOL accounts issued to them through AOL. There is not one documentary piece of evidence in the record that shows that AOL accounts were ever issued to any Maeslake employees. They accessed those personally? Is that what you're saying? That the AOL account that was accessed, that the AOL account of Diane was accessed, that was a personal account. And it's undisputed that that particular email address was not issued by Maeslake. But just to highlight, no employees at Maeslake at any time ever had an AOL account. They had CompuServe and then it switched over to Comcast. Not one witness testified affirmatively that there was ever an AOL account issued to them at any time. And there's not one piece of evidence in the record to show that Maeslake issued AOL accounts to its employee, to any of its employees. All of them at the time, at the time these emails were accessed, everyone had Comcast accounts. Katherine Maxwell? Prior to that they had CompuServe. Prior to that they had CompuServe. And then they got Comcast in 2004. And that was the email address that Diane was using and the other employees were using since 2004. Everybody testified that their Comcast address was kmaxwell2 at Comcast.com, dianeborchers at Comcast.com, and frigo at Comcast.com. Nobody could even recall when asked, okay, if you had an AOL account at one point at Maeslake, what was that address? Nobody could even remember what it would have been. And there's nothing in the record to support otherwise. And I guess going back to counsel's argument, I'm somewhat shocked that, and just taking a little bit of a change of path, I'm somewhat shocked that counsel disclosed attorney-client privilege to support her case today when she objected to every single, almost every single question asked at Frigo and Maxwell's deposition. So I'm somewhat shocked to say that she, or somewhat shocked to hear that she said that she didn't interview or investigate Katherine Maxwell at all. So I'm somewhat shocked to hear that she's now alleging that she made no such investigation, but nonetheless at her depositions objected to several, several questions asked of Katherine. And then I also wanted to make a point that counsel was making, which was that we waited and waited and waited to add these people as defendants. Krupski clearly holds that the speed at which a party moves to amend, to add defendants, is entirely irrelevant. Federal Rule 15 doesn't speak to that, and certainly the 2616 of the Illinois Civil Code of Procedure does not speak to the speed at which a party moves to amend. Also, the notice as held in Krupski does not have to be formal.  Well, how do you respond to her argument with respect to the letter that Maxwell had written basically indicating, I knew that they were looking at my stuff, I knew they went to my account? Well, again, the letter, she has suspicions. You know, to take those suspicions and equate them with actual knowledge borders on frivolity. And that borders on a violation of Rule 137, which requires parties to make pleadings in good faith after reasonable inquiry. And I think going off someone's sheer suspicions is certainly not one of them. And when you're going to go and sue a person, that's a serious thing to do. And to go off your sheer suspicions would really border along or run contrary to those principles. And with that logic, and if counsel is arguing that we should be going off of what she said or suspected in her letter, then it's very likely that she would have named, or it's very possible, I should say, that she would have named Frigo as a defendant and Dreyfus as a defendant. And Dreyfus ended up not being named as a defendant, and we'd be still sitting here in the same situation with Maxwell. And under Krupski, again, Maxwell can be added, or the claims against Maxwell can be related back. And I think that I'd also like to point out that this Court's holding in Siebert is essentially reaffirmed or reconfirmed by the holding in Krupski. In Siebert, this Court found that inadvertence, and this was before Section 2616 was amended to have the mistake language, but it involved inadvertence language, which is essentially the same thing. And this Court held that inadvertence means excusable ignorance, which encompasses lack of knowledge of the identity of the defendant. The Court concluded that it would be unfair to prevent relation back when a more diligent plaintiff files suit well before the statute of limitations but learns of the proper defendant after the statute of limitations period. And that was what this Court held prior to Krupski. But with Krupski, it's reconfirmed that a lack of knowledge or such as inadvertence or inadvertence in naming the proper defendant is the same situation, and that's what Krupski holds as well. And the policy behind that is to have cases resolved on their merits and not based on technicalities. The statute of limitations is hardly a technicality. Right. Under your theory, when does a potential wrongdoer or when can that potential wrongdoer assume finality of an event? You're telling me the statute of limitations doesn't work? Right. At what point can a potential defendant say, I'm done? I wasn't sued. I wasn't brought into a case. Does it go on forever? No. It doesn't go on forever, but it certainly should not terminate while the case is pending and while discovery is pending. But discovery was over. Discovery was never closed. Who would assume to me, with all due respect, that you two did not read the same record? But, I mean, we've had dispute after dispute over the facts here. My question to you is when can a defendant or would-be defendant assume the case is over with respect to them? When the case is finally adjudicated at the end of a case. So, if I'm a witness, I have to assume that no matter how long a case is pending in the courts or maybe goes up on appeal, comes back down for a retrial, at any time, I could potentially be named a defendant. Is that your theory? I think that the code of civil procedure says reasonable time. I think that the reasonable time here where she was disclosed as a witness and referred to as a defendant in an answer to interrogatory. Well, again, counsel disputes that, so. I think that if we look at the answers to interrogatories, it's very clear, and the record speaks for itself, that that is a reasonable time. That was less than 120 days after the statute of limitations expired. So, are you hitting your head on the fact that it's less than 120 days? I'm sorry? Are you hanging your head on the fact that this additional defendant was added less than 120 days after the termination of the statute of limitations? I'm just highlighting the 120 days because of the federal rule, where our rule doesn't even have a time period. So, it's an open-ended question, but what I'm saying is that it was at the most four months that, between the statute of limitations expiring, and when she should have, or Maxwell, should have known, or knew or should have known that she would have been named as a defendant, that she was the intended party or the intended defendant of this lawsuit. That is when she should have known. That is a very reasonable amount of time period under the circumstance because there is no other way to ascertain the identities of these individuals. Does she have to have actual notice of the suit during the term of statute of limitations? No, Kroposky holds that notice does not have to be formal. It can be constructive, and there are reports that say that notice can be simply hearing that something was filed. And also, the last point that I would like to make is that the second part of the Kroposky analysis is whether the newly named defendants are prejudiced in their ability to defend themselves based on being added. And I don't think I touched upon that, but they certainly aren't prejudiced in this case. They have been vigorously defended even before being named as defendants. They've addressed the claims as to their individual status, both at the trial court and in this appeal. So there's certainly no prejudice. And if there is no relation back, repose would certainly be a windfall in this case.  Thank you.